# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,

          Plaintiff,

v.

Meredith Amber Dirksmeyer (1) and
John Henry Cone-Wade, Sr. (2),

          Defendants.

Case No. 23-CR-338 (JRT/JFD)

**REPORT AND RECOMMENDATION and ORDER**

## I.    Introduction

This case is before the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1 for a report and recommendation on Defendants' dispositive pretrial motions and for an order on Defendants' remaining nondispositive pretrial motions. Defendant Meredith Amber Dirksmeyer's currently pending dispositive motions are a Motion to Suppress Evidence from Search Warrants (Dkt. No. 57), Motion to Suppress Evidence from Search and Seizure (Dkt. No. 59), and Motion to Suppress Statement (Dkt. No. 115), while her nondispositive motions are a Motion for a *Daubert* Hearing (Dkt. No. 99) and Motion for a *Franks* Hearing (Dkt. No. 125). Defendant John Henry Cone-Wade, Sr.'s currently pending dispositive motions are a Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. No. 54), Motion to Suppress Evidence Obtained as a Result of Search and Seizure of Four Phones (Dkt. No. 55), and Motion to Suppress Ion Swab Evidence (Dkt. No. 107). His

nondispositive motions are a Motion for a *Daubert* Hearing (Dkt. No. 106) and Motion for Hearing Pursuant to *Franks v. Delaware* (Dkt. No. 128).

Both Defendants are charged with Conspiracy to Distribute Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846; and two counts of Possession with Intent to Distribute Methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(A), and 18 U.S.C. § 2. (Superseding Indictment, Dkt. No. 16.) Ms. Dirksmeyer is charged with an additional count of Possession with Intent to Distribute Methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and 841(b)(1)(C). The charges stem from events on September 8, 2023, when investigators searched Ms. Dirksmeyer's Jeep Grand Cherokee and her apartment in New Hope, Minnesota. Investigators seized methamphetamine from Ms. Dirksmeyer's vehicle and seized methamphetamine, a handgun, and cash from her apartment. Ms. Dirksmeyer later implicated Mr. Cone-Wade in a statement she made to law enforcement.

The Court held a motions hearing on June 14, 2024. Assistant United States Attorney Thomas Hollenhorst represented the United States. Thomas Shiah represented Ms. Dirksmeyer, and John L. Fossum represented Mr. Cone-Wade. After the hearing, the parties filed post-hearing briefs (Dkt. Nos. 123, 124, 127, 132), and Defendants filed motions for *Franks* hearings (Dkt. Nos. 125, 128). The Court took all of the currently pending motions under advisement on August 5, 2024, the date of the last filing.

Ms. Dirksmeyer seeks to suppress evidence from nine search warrants: a warrant for information, including pen register and trap and trace ("PRTT") information,[1] for phone number 612-210-xxxx (Gov't Ex. 1)[2]; a tracker warrant for her 2017 Jeep Grand Cherokee (Gov't Ex. 2); a warrant for historical cell phone records for 612-210-xxxx (Gov't Ex. 3); a search warrant for her person and Jeep Grand Cherokee (Gov't Ex. 4); a search warrant for her apartment in New Hope, Minnesota (Gov't Ex. 5); a search warrant for four cell phones (Gov't Ex. 6); a search warrant for an iPhone (Gov't Ex. 8); a warrant for information, including PRTT information, for phone number 469-712-0xxx (Gov't Ex. 9); and a tracker warrant for a 2011 Infiniti (Gov't Ex. 14). In addition, she moves to suppress evidence obtained during a traffic stop on September 8, 2023; a statement she made to law enforcement on September 9, 2023; and statements she made to law enforcement on November 13, 2023.

Mr. Cone-Wade seeks to suppress evidence seized from Ms. Dirksmeyer's apartment (*see* Gov't Ex. 5) and from four cell phones (*see* Gov't Ex. 6) for lack of probable

---

[1] A pen register tracks numbers called from a telephone and the duration of the call; a trap and trace device tracks the numbers that call into a particular telephone and the duration of the call. No call content is obtained. 18 U.S.C. § 3127(3), (4).

[2] This search warrant, and a similar one for phone number 469-712-0xxx, seek, among other information, PRTT information. The United States can obtain such information with a court order issued pursuant to 18 U.S.C. § 3123, rather than a search warrant. All that a PRTT application need show is that the applicant is an attorney for the government or a federal law enforcement officer and that the information likely to be obtained is relevant to an ongoing criminal investigation. 18 U.S.C. § 3122(b). Despite the apparent advantage to the applicant of this minimal showing, prosecutors often, the Court assumes for administrative efficiency, include PRTT information as just one type of information sought in a more comprehensive search warrant.

cause. He also asks for the exclusion of evidence seized pursuant to search warrants for which ion swab evidence was included in the supporting affidavit and evidence seized during searches conducted with muted body cameras. Mr. Cone-Wade contends that officers who obtained the ion swab evidence and muted their body cameras acted in bad faith and violated due process.

Both Defendants ask for a hearing pursuant to *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. 579 (1993), to determine whether the United States has established that the use of ion swabs or scans in an investigation rests on a foundation that is scientifically valid. Both Defendants also ask for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

In the United States' post-hearing memorandum, the United States argues that all contested search warrants were supported by probable cause, but if not, the *Leon* good faith exception applies. In addition, the United States represents that it will not offer any of Ms. Dirksmeyer's statements in its case in chief, so her motions to suppress statements are moot. The United States objects to a *Daubert* hearing or a *Franks* hearing, opposes Defendants' requests to suppress ion swab and scan evidence, and contends that no investigating officer acted in bad faith or violated due process.

## II.   Relevant Facts

### A.   Warrant for 469-712-0xxx, dated July 19, 2023 (Gov't Ex. 9)

Olmsted County Sheriff's Office Detective Sean Cooper applied for a warrant for information, including PRTT information, for telephone number 469-712-0xxx on July 19, 2023, in connection with his investigation of Ms. Dirksmeyer for controlled substance

4

crimes. (Gov't Ex. 9 at 1.) He averred the following relevant information in the supporting affidavit.

On July 18, 2023, Detective Cooper and Detective Joel Johnson received information from a "cooperating defendant," who was known to law enforcement, had provided corroborated information in the past, and "had no crimes of dishonesty." (*Id.* at 2.) The cooperating defendant said that Ms. Dirksmeyer was involved in transporting and selling methamphetamine from the Twin Cities to Olmsted County in a black Jeep. (*Id.*) The cooperating defendant had personally bought methamphetamine from Ms. Dirksmeyer by calling her cell phone number. (*Id.*) The cooperating defendant said they were present during a sale of methamphetamine from Ms. Dirksmeyer to Mark Sanford at 4xx Main Street South, Trailer #x, in Stewartville, Minnesota. (*Id.*) According to the cooperating defendant, Ms. Dirksmeyer had a large amount of methamphetamine in a plastic bag. (*Id.* at 3.) Detective Cooper knew that Mr. Sanford lived in that trailer and was a known methamphetamine user, and the detective saw a baggie of suspected methamphetamine in Mr. Sanford's trailer during the execution of an arrest warrant there on June 13, 2023. (*Id.*) A second cooperating defendant told another officer in February 2023 that Ms. Dirksmeyer was involved in methamphetamine trafficking from the Twin Cities to Olmsted County. (*Id.*)

Detective Cooper learned that Ms. Dirksmeyer had called police dispatch from the telephone number 469-712-0xxx in November 2022 to report a hit-and-run crash. (*Id.*) Her vehicle was a 2017 Jeep Grand Cherokee, with the Minnesota plate GZXxxx. (*Id.*) Ms. Dirksmeyer is a co-registered owner of the Jeep Grand Cherokee, with a listed address of

8xxx 46th Avenue North, Apartment 1xx, New Hope, Minnesota. (*Id.*) The telephone number 469-712-0xxx is a Verizon telephone number, and the subscriber is Ms. Dirksmeyer, with the address of 8xxx 46th Avenue North, Apartment 1xx, New Hope, Minnesota. (*Id.*) Detective Cooper believed Ms. Dirksmeyer used telephone number 469-712-0xxx. (*Id.*)

### B.   Tracker Warrant for 2011 Infiniti, dated July 26, 2023 (Gov't Ex. 14)

On July 26, 2023, Detective Cooper applied for a tracker warrant for a 2011 Infiniti QX56, which was registered to Ms. Dirksmeyer. (Gov't Ex. 14 at 1.) The supporting affidavit repeated all of the information that had been included in the affidavit for the PRTT Warrant for 469-712-0xxx. The following additional information was also included.

On July 22, 2023, Investigator "Salley" went to Ms. Dirksmeyer's address at 8xxx 46th Avenue North in New Hope, Minnesota, and saw a black Jeep Grand Cherokee and an Infiniti QX56, both registered to Ms. Dirksmeyer. (*Id.* at 3.) Investigator Salley obtained ion scan samples from the door handles of both vehicles. (*Id.*) The samples were separately sealed and transported on July 25, 2023, to the Minnesota National Guard Counterdrug program. (*Id.*) The Counterdrug program has drug detection scanners also known as "ion scanners." (*Id.*) Ion scanners are extremely sensitive and can detect minute traces of substances. (*Id.*) Before scanning the swabs, a qualified operator showed Investigator Salley documentation that the machine was calibrated and operating properly. (*Id.*) The ion scanner detected the presence of "methamphetamine and tetrahydrocannabinol (THC)" from the swab of the Infiniti. (*Id.*) No controlled substances were detected from the swab of the Jeep Grand Cherokee. (*Id.*)

### C.   Warrant for 612-210-xxxx, dated August 1, 2023 (Gov't Ex. 1)

Detective Cooper applied for a PRTT warrant for 612-210-xxxx on August 1, 2023, in connection with his investigation of Ms. Dirksmeyer for controlled substance crimes. (Gov't Ex. 1 at 1.) The supporting affidavit repeated all of the information that had been included in his previous two affidavits. The following additional information was also included.

Ms. Dirksmeyer and her parent, Cheryl Dirksmeyer,[3] are co-registered owners of the Jeep Grand Cherokee. (*Id.* at 3.)

According to Verizon, a number similar to the 469-712-0xxx telephone number—469-712-*1*xxx—was for an iPad, not a phone, and a warrant would yield usage data but not call data. (*Id.*)

On July 27, 2023, Detective Cooper obtained a phone number for a contact listed as "Mary" on the cooperating defendant's phone: 612-210-xxxx. (*Id.*) The phone number was serviced by Verizon, and Cheryl Dirksmeyer was the account subscriber. (*Id.*) Detective Cooper knew that drug dealers often use their phones to communicate with suppliers and customers and to navigate. (*Id.*) He believed Ms. Dirksmeyer used phone number 612-210-xxxx. (*Id.*)

---

[3] The Court refers to Defendant Meredith Amber Dirksmeyer as "Ms. Dirksmeyer" and to Ms. Dirksmeyer's parent as "Cheryl Dirksmeyer."

### D.     Tracker Warrant for 2017 Jeep Grand Cherokee, dated August 29, 2023 (Gov't Ex. 2)

Detective Cooper applied for a tracker warrant for Ms. Dirksmeyer's Jeep Grand Cherokee on August 29, 2023. (Gov't Ex. 2 at 1.) He averred the following relevant information in the supporting affidavit.

Detective Cooper first repeated the information included in his previous affidavits. In addition, from electronic surveillance of the 612-210-xxxx number, Detective Cooper believed that Ms. Dirksmeyer used the Jeep Grand Cherokee as her primary vehicle because the location of the 612-210-xxxx device rarely matched that of the Infiniti. (*Id.* at 4.) On several occasions in August 2023, Detective Cooper observed the 612-210-xxxx phone leave Ms. Dirksmeyer's residence, travel through different towns, and make multiple stops, which, in Detective Cooper's experience, was consistent with narcotics trafficking, particularly one trip with multiple stops in the middle of the night. (*Id.*) When these trips took place, a tracking device placed earlier on the Infiniti showed that the location of the Infiniti "rarely matched the device's location," leading Detective Cooper to believe Ms. Dirksmeyer was using the Jeep Grand Cherokee.

On August 29, 2023, Detectives Cooper and Johnson went to Ms. Dirksmeyer's New Hope apartment, and Detective Johnson obtained two ion scan samples from the door handles of the Jeep Grand Cherokee. (*Id.*) The samples were separately sealed and taken to the Counterdrug program. (*Id.*) The scanning procedure was the same as before, and a qualified operator detected methamphetamine from one of the swabs and cocaine from the other. (*Id.* at 4–5.)

**E.      Search Warrant for Historical Records for 612-210-xxxx, dated September 1, 2023 (Gov't Ex. 3)**

On September 1, 2023, Detective Cooper applied for a search warrant for historical records for 612-210-xxxx. (Gov't Ex. 3 at 1.) Detective Cooper repeated the information included in his earlier affidavits. (*Id.* at 2–5.)

In addition, on August 7, 2023, Detective Cooper observed the 612-210-xxxx device leave Ms. Dirksmeyer's residence, leave the Twin Cities metropolitan area, and travel to the towns of Hampton, Dennison, and Wanamingo. (*Id.*) The device did not stop in any area for more than 15 minutes. (*Id.*) Detective Cooper believed the pattern of travel to be consistent with narcotics trafficking. (*Id.*) Phone tolls around the trip time revealed frequent calls and texts with a phone number listed to Pamela Jo Brown of Winona, who is known to be a methamphetamine user. (*Id.*)

On August 17, 2023, Ms. Dirksmeyer's device left her residence and traveled to Rochester. (*Id.*) Phone tolls showed voice and text contacts between the device and a phone number listed to Chad Swenson in Le Roy, Minnesota, who is known to have a history of controlled substance sales and possession. (*Id.* at 4–5.) The device was also in contact with a phone number listed to Mark Gilbertson of Rochester, who has a first-degree controlled-substance conviction. (*Id.* at 5.) Multiple Cash App texts were logged during this trip as well, and Detective Cooper knows that drug dealers frequently use Cash App for drug transactions. (*Id.*)

On August 26, 2023, officers observed the 612-210-xxxx device depart Ms. Dirksmeyer's residence at 11:43 p.m. and arrive in Rochester at 1:23 a.m. (*Id.*) The device

left Rochester at 2:08 a.m., traveled to a rural area near Racine and Spring Valley at 2:38 a.m., left that area at 4:08 a.m., and arrived back at the New Hope apartment at 6:38 a.m. (*Id.*) Phone tolls showed calls with Tyler Miller, a known methamphetamine dealer, and Chad Swenson. (*Id.*) Several Cash App texts were also logged. (*Id.*)

Detective Cooper requested a search warrant to obtain and search text message content sent from and received by telephone number 612-210-xxxx from August 21–28, 2023; a log of the incoming and outgoing calls on those dates; and account information such as subscriber name, date of birth, primary address, other associated addresses, email address, and billing information. (*Id.* at 5–6.)

### F.     Search Warrant for 2017 Jeep Grand Cherokee and Meredith Amber Dirksmeyer, dated September 8, 2023 (Gov't Ex. 4)

On September 8, 2023, Detective Cooper applied for a search warrant for Ms. Dirksmeyer and her Jeep Grand Cherokee. (Gov't Ex. 4 at 2.) He averred the following relevant information in the supporting affidavit.

Detective Cooper repeated the information included in his previous affidavits. (*Id.* at 3–8.) In addition, he attested that the location of the 612-210-xxxx phone number consistently matched that of the Jeep Grand Cherokee, and he believed Ms. Dirksmeyer used the Jeep Grand Cherokee as her primary vehicle. (*Id.* at 8.)

On August 30, 2023, between 7:32 p.m. and 10:56 p.m., the mobile tracking devices showed Ms. Dirksmeyer making several short stops at gas stations and a grocery store, which was consistent with narcotics trafficking. (*Id.*) On September 1, 2023, Detectives Cooper and Johnson met with a confidential informant, who said he could buy

methamphetamine from Tyler Miller, whose number was known to Detective Cooper to be in Ms. Dirksmeyer's phone tolls. (*Id.* at 9.) The informant said that a female from the metropolitan area supplied the methamphetamine to Mr. Miller. (*Id.*) Two days later, on September 3, 2023, Ms. Dirksmeyer left her residence in New Hope at 1:07 a.m. and traveled to several different areas in the Twin Cities metropolitan area, making short stops along the way, before returning to her residence at 5:45 a.m. (*Id.*) This was consistent with narcotics trafficking, according to Detective Cooper. (*Id.*)

On September 8, 2023, at 7:22 p.m., the tracking devices on the Jeep Grand Cherokee and Ms. Dirksmeyer's phone departed her residence in New Hope and traveled toward Olmsted County. (*Id.*) Detective Cooper immediately sought a search warrant to conduct a traffic stop and search the Jeep Grand Cherokee and Ms. Dirksmeyer. (*Id.*) The search warrant was signed by Judge Christa M. Daily at 7:34 p.m. (*Id.* at 14.) Officers executed the warrant between that time and 8:20 p.m. and seized methamphetamine and cash, among other items. (*Id.* at 15.)

G.    **Search Warrant for 8xxx 46th Avenue, Apartment 1xx, New Hope, Minnesota, dated September 8, 2023 (Gov't Ex. 5)**

On September 8, 2023, at 10:20 p.m., Detective Cooper applied for a search warrant for Ms. Dirksmeyer and her Jeep Grand Cherokee. (Gov't Ex. 4 at 2.) He averred the following relevant information in the supporting affidavit.

Detective Cooper repeated the information included in his previous affidavits. (*Id.* at 3–8.) In addition, on September 8, 2023, after obtaining the warrant to stop and search the Jeep Grand Cherokee and Ms. Dirksmeyer, Detective Cooper encountered the vehicle

as it entered Olmsted County. (*Id.*at 9.) A State Trooper conducted a traffic stop at 8:19 p.m. (*Id.*) Ms. Dirksmeyer was detained, and the search warrant was executed. (*Id.*) Officers seized two large plastic bags containing 1,573.8 grams of methamphetamine. (*Id.*) Ms. Dirksmeyer was arrested and transported to the Olmsted County Adult Detention Center. (*Id.* at 10.)

Detective Cooper applied for a nightcapped search warrant because the traffic stop had occurred at night, just two hours earlier. (*Id.* at 11.) The search warrant was executed at 11:00 p.m., and the following items were seized, among others: a safe with cash, a safe containing methamphetamine, a "meth plate," a handgun, bullets, a "Phone in black and white case," an "iPhone in no case," "Samsung" on the living room floor, and a "Samsung phone" in a bedroom dresser. (*Id.* at 16.)

### H.     Search Warrant for Four Cell Phones, dated September 13, 2023 (Gov't Ex. 6)

On September 13, 2023, Detective Cooper applied for a search warrant for four phones: "Phone in black/white case," "iPhone with no case," "Samsung phone," and "Samsung phone." (Gov't Ex. 6 at 1.) In the supporting affidavit, Detective Cooper repeated the information included in his previous affidavits (*id.* at 2–8) and also added the following relevant information.

On September 8, 2023, 11.9 pounds of methamphetamine were seized from Ms. Dirksmeyer's apartment pursuant to the search warrant executed there. (*Id.* at 9.) A phone in a black and white case (logged as evidence item #8) and an iPhone in no case (logged as evidence item #9) were located on the living room end table. (*Id.*) A Samsung phone

was found on the living room floor (logged as evidence item #10), and a second Samsung phone was found on a dresser in the primary bedroom (logged as evidence item #18). (*Id.*)

According to Detective Cooper, Ms. Dirksmeyer gave a post-*Miranda* statement admitting ownership of everything seized from the Jeep Grand Cherokee and the New Hope apartment. (*Id.*) A continued search of the Jeep Grand Cherokee on September 11, 2023, yielded an additional amount of methamphetamine, cash, a Cash App Visa debit card, a credit card in Ms. Dirksmeyer's name, and a debit card in Ms. Dirksmeyer's name. (*Id.* at 9–10.) In Detective Cooper's training and experience, he knows that drug dealers often use cell phones, that phones can store data related to drug sales, and that text messages and apps show details of one's whereabouts. (*Id.* at 10.)

### I.      Search Warrant for iPhone, dated September 15, 2023 (Gov't Ex. 8)

Detective Cooper applied for a search warrant for an "Apple iPhone with gold case" on September 15, 2023. (Gov't Ex. 8 at 1.) The application included information set forth in previous search warrant applications, as well as the following information. During the stop of the Jeep Grand Cherokee, Detective Johnson located an Apple iPhone in a gold case in a holder on the dashboard. (*Id.* at 8.) The phone was seized and secured in a cell phone locker in the Olmsted County Law Enforcement Center evidence room. (*Id.*) The phone was later checked back out to Detective Cooper. (*Id.* at 9.)

### J.      Relevant Hearing Testimony

Detective Cooper testified to the following relevant facts at the pretrial motions hearing. On August 29, 2024, Detective Cooper was present when Detective Johnson swabbed Ms. Dirksmeyer's Jeep Grand Cherokee and Infiniti. (Mot. Hr'g Tr. at 39, Dkt.

No. 119.)[4] The Jeep Grand Cherokee was parked in the parking lot of the apartment building, and many people walked through and by while the detectives were there. (*Id.* at 39, 52.)

The procedure for testing a swab includes verifying that the machine is working properly by using a blank swab; inserting the test swab in the machine; pressing the test button; and reading the results after five to ten seconds. (*Id.* at 46–47.) The test will show what controlled substance, if any, was detected, and the percentage the substance tested positive for. (*Id.* at 47.) Detective Cooper is now trained to operate the ion scanning instrument, but he was not trained when the ion scans occurred in this case. (*Id.* at 43.) His training consisted of reviewing a training manual and viewing an online training program with video demonstrations. (*Id.* at 46.)

Reports were prepared for both the July 22 and the August 29 ion scans. (*Id.* at 48.) The ion scan report of the Infiniti showed positive results for methamphetamine and "Tetryl C," which is not the same as tetrahydrocannabinol. (*Id.* at 113–14.) Detective Cooper interpreted "Tetryl C" as THC, based on the ion scanning machine operator's explanation. (*Id.* at 114.)

The Olmsted County Sheriff's Office does not require officers to write reports of ion swabs and scans, but it does require a written report when evidence is collected pursuant to a search and seizure. (*Id.* at 50, 110.) The department does not require officers to wear

---

[4] The motion hearing transcript is currently filed under seal, but the Court has not included any personal identifiers or other confidential information in this Report and Recommendation and Order.

body cameras when working undercover. (*Id.* at 51.) Officers generally are required to activate their squad car camera when searching outdoors, but Detective Cooper's unit was excepted from that requirement. (*Id.* at 110–11.)

On September 8, 2023, Detective Cooper saw the tracking device on the Jeep Grand Cherokee and Ms. Dirksmeyer's cell phone travel from her residence towards the Rochester area. (*Id.* at 54.) He believed she was engaging in drug trafficking and applied for a search warrant. (*Id.*) The warrant was issued at 7:34 p.m., and the traffic stop of Ms. Dirksmeyer occurred after the search warrant was obtained. (*Id.* at 54–55.)

## III.   General Principles

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV. "Issuance of a search warrant must be supported by probable cause, which depends on whether, under the totality of the circumstances, there is a fair probability evidence of a crime will be found in a particular place." *United States v. Faulkner*, 826 F.3d 1139, 1144 (8th Cir. 2016); *see* Fed. R. Crim. P. 41. "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). After a judicial officer has issued a warrant upon a finding of probable cause, that finding normally deserves great deference. *Id.* at 236.

When the issuing judge relies on the supporting affidavit to issue a search warrant, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause." *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005). "The affidavit should be examined under a common sense approach and not in a hypertechnical fashion." *Id.* (cleaned up); *accord United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995) ("Affidavits must be read in 'a common-sense and realistic fashion . . . .'"). Therefore, "[w]hen reviewing the issuance of a warrant, [this Court] afford[s] great deference to the issuing judge's probable-cause determination, ensuring only that the judge 'had a substantial basis for concluding that a search warrant would uncover evidence of wrongdoing.'" *United States v. Petruk*, 929 F.3d 952, 959 (8th Cir. 2019).

A warrant is supported by probable cause if, "given all the circumstances set forth in the affidavit, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability" that contraband or evidence of a crime will be found in the place to be searched. *United States v. Edmiston*, 46 F.3d 786, 789 (8th Cir. 1995) (cleaned up). "To establish probable cause, an officer may rely on an informant's tip." *United States v. Caswell*, 436 F.3d 894, 898 (8th Cir. 2006). "When an informant has provided reliable information in the past *or* where his tip was independently corroborated, a court may deem the informant's tip sufficiently reliable to support a probable cause determination." *Id.* (emphasis added). Under the reliable-information-in-the-past option, "[t]he reliability of a confidential informant can be established if the person has a history of providing law enforcement officials with truthful information." *United States v. Wright*,

145 F.3d 972, 975 (8th Cir. 1998). Under the independent-corroboration option, "[i]t is well established that even the corroboration of minor, innocent details can suffice to establish probable cause." *Solomon*, 432 F.3d at 828 (cleaned up).

"The exclusionary rule generally prohibits admission of evidence seized during an unlawful search," *United States v. Escudero*, 100 F.4th 964, 968 (8th Cir. 2024). In *United States v. Leon*, the Supreme Court held that the exclusionary rule did not apply when the police obtain evidence by acting in "objectively reasonable reliance" on a search warrant. 468 U.S. 897, 922 (1984); *see also Herring v. United States*, 555 U.S. 135, 142 (2009) (quoting *Leon*, 468 U.S. at 922). The purpose of the exclusionary rule is to deter police misconduct, and where the police have relied, not on their own assessment of the evidence, but on the probable cause determination of a neutral and disinterested judge, there is no police misconduct, and thus, nothing to deter through application of the exclusionary rule. *Herring*, 555 U.S. at 142; *Leon*, 468 U.S. at 916.

The *Leon* good-faith exception does not apply in the following four scenarios:

(1) the supporting affidavit or testimony includes a false statement made knowingly and intentionally or with reckless disregard for the truth to mislead the issuing judge; (2) the issuing judge wholly abandoned his judicial role in issuing the warrant; (3) the affidavit in support of the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; or (4) the warrant is so facially deficient that no police officer could reasonably presume the warrant to be valid.

*United States v. Ortiz-Cervantes*, 868 F.3d 695, 702–03 (8th Cir. 2017) (quoting *Leon*, 468 U.S. at 923) (cleaned up).

## IV.     Discussion

### A.     Ms. Dirksmeyer's Motion to Suppress Statements Should Be Denied as Moot.

The United States has represented that it will not use any of Ms. Dirksmeyer's statements in its case-in-chief at trial. Ms. Dirksmeyer's motions to suppress statements are therefore moot and should be denied as moot. *E.g., United States v. Morris*, No. 17-CR-107 (DWF/TNL), 2018 WL 2193109, at *9 (D. Minn. May 14, 2018); *United States v. Martin*, No. 14-CR-125 (MJD/LIB), 2014 WL 3700917, at *3 (D. Minn. July 25, 2014); *United States v. Lindsey*, No. 10-CR-15 (JNE/JJK), 2010 WL 4822925, at *1 (D. Minn. Nov. 22, 2010), *aff'd in part*, 702 F.3d 1092, 2013 WL 85451 (8th Cir. 2013); *United States v. Fenstermaker*, No. 07-CR-78 (DSD/RLE), 2007 WL 1242891, at *1 (D. Minn. Apr. 27, 2007).

### B.     No Evidence Was Obtained from the Warrant for 469-712-0xxx (Gov't Ex. 9), and this Aspect of the Motion to Suppress Evidence Is Moot.

According to Detective Cooper's supporting affidavit, Ms. Dirksmeyer was the subscriber of 469-712-0xxx, which was a Verizon telephone number. 469-712-0xxx was the subject of the warrant in Government Exhibit 9. Another, similar number—469-712-*1*xxx—was for an iPad, not a phone, and Verizon told investigators that a warrant would yield usage data but not call data.

The United States argues in its post-hearing brief that no evidence was obtained from the execution of the warrant for 469-712-**0**xxx because it was assigned to an iPad, and thus there is no evidence to suppress. The United States has conflated the 469-712-

18

**1**xxx number, which was assigned to an iPad, with the 469-712-0xxx number, which was a telephone number. But the result is the same. No evidence was seized pursuant to the warrant for 469-712-0xxx (*see* Gov't Ex. 9 at 12), presumably because when the warrant was served, Verizon told the officers that the subscriber was Cheryl Dirksmeyer, not Ms. Dirksmeyer (*see* Mot. Hr'g Tr. at 92). In any event, there is no evidence to suppress, and the request to suppress should be denied as moot.

### C.  Mr. Cone-Wade Has Not Demonstrated a Reasonable Expectation of Privacy in Any of the Places Searched or Items Seized.

"Fourth Amendment rights are personal rights that may not be asserted vicariously." *United States v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004). A person "must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally." *United States v. Gomez*, 16 F.3d 254, 256 (8th Cir. 1994).

Mr. Cone-Wade has not shown a reasonable expectation of privacy in any of the places searched or the items seized, nor has he even argued that he has one. The Court finds that he has no standing to raise a Fourth Amendment challenge to the searches and seizures at issue, and to the extent his motions to suppress evidence are grounded in the Fourth Amendment, they should be denied. Mr. Cone-Wade's motion for a *Franks* hearing is denied for the same reason. He has shown no reasonable expectation of privacy in any of the places searched or the items seized.

**D.     A Search Warrant Was Not Required for the Collection of Ion Swab Samples from the Exterior Door Handles of Ms. Dirksmeyer's Jeep Grand Cherokee on August 29, 2023.**

Ms. Dirksmeyer challenges the inclusion of ion swab evidence in the affidavits supporting the search warrants in Gov't Exs. 1, 2, 3, 4, 5, 6, 8, 9, and 14. She first argues that law enforcement officers were required to obtain a search warrant before swabbing the door handles of her Jeep Grand Cherokee on August 29, 2023. She relies, in part, on *United States v. Carter*, No. 20-CR-35 (MJD/KMM), 2020 WL 6136480 (D. Minn. Sept. 18, 2020), *R. & R. adopted*, 2020 WL 6135901 (D. Minn. Oct. 19, 2020), in which then-Magistrate Judge Katherine Menendez wrote in a footnote, "There is no dispute in this case that an ion scan is a search and that a warrant was required." *Id.* at *6 n.3. Ms. Dirksmeyer misreads *Carter* when she treats "there is no dispute" in this quote as a synonym for "obviously" or "clearly," as in "obviously an ion scan is a search" or "clearly an ion scan is a search." Judge Menendez did not say that. Judge Menendez noted that the United States, in its pre-hearing memorandum, conceded that "[t]he government does not dispute that, in this circumstance, the area immediately in front of Carter's townhome, including his entry door, was 'curtilage' and that officers were required to obtain a warrant to search there." Gov't Pre-Hr'g Resp. at 6, *United States v. Carter*, No. 20-CR-35 (MJD/KMM), (D. Minn. June 1, 2020), Dkt. No. 40. This concession has nothing to do with the constitutionality of an ion scan because it is only a concession that officers were in a place the Constitution did not allow them to be in order to conduct the scan.

The United States, on the other hand, relies on *United States v. Jones*, No. 23-CR-269 (JRT/DLM), 2024 WL 1810220 (D. Minn. Apr. 25, 2024) ("*Jones I*"), in which the

constitutionality of a warrantless ion swab scan of an exterior apartment door was at issue. *Jones I* was decided by the Honorable John R. Tunheim, who is the district judge assigned to this case. In *Jones I*, police officers conducted a warrantless ion swab scan of an apartment doorknob and lock that were mounted on an apartment door that opened to an interior common hallway of the apartment building. One did not have to pass through any locked doors to get from the outside to the interior common hallway. *Id.* at *1. Judge Tunheim considered whether the doorknob and lock were part of the home's curtilage, in which case the defendant would have a reasonable expectation of privacy. *Id.* at *3. If there was no reasonable expectation of privacy, however, "there is no Fourth Amendment violation." *Id.* at *2. Judge Tunheim decided the doorknob and lock were not part of the home's curtilage because they were in a common space and accessible to the public; the contact of the ion swab scan was similar to the uses to which the doorknob and lock were put; the defendant, a renter, lacked the right to exclude others from interfering with his door's exterior; and the apartment building was unlocked. *Id.* Accordingly, the defendant did not have a reasonable expectation of privacy in the doorknob and lock, and the ion swab scan was not a search. *Id.* at *3–4.

Neither *Carter* nor *Jones I* is directly applicable here because both those decisions decided the issue of whether a search occurred by analyzing whether officers had to enter a residence's curtilage in order to conduct the swab that gathered the material that would be tested in the ion scanner. Curtilage is a concept that applies only to residences. Here, the ion scan swabbing was done of vehicles, and vehicles do not have curtilage.

21

Moving on from curtilage, Ms. Dirksmeyer contends that the ion swab of her Jeep Grand Cherokee was a trespass on her Fourth Amendment "effect," was conducted solely for the purpose of investigation, and therefore was a Fourth Amendment search for which a warrant was required. (Def. Dirksmeyer's Suppl. Mem. Supp. Mot. Suppress at 1, Dkt. No. 100.)

In *Jones v. United States*, 565 U.S. 400 (2012) ("*Jones II*"), the Supreme Court held that the installation of a GPS tracking device on a vehicle and the subsequent use of that device to track the vehicle's movements was a Fourth Amendment search. *Id.* at 404 ("It is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information."). The Supreme Court reached this holding not by examining whether the vehicle's owner had a reasonable expectation of privacy in the underbody of his vehicle, but whether government agents had trespassed on the defendant's "effect" (his vehicle). *Id.* at 405 ("[I]t is beyond dispute that a vehicle is an 'effect'" and that a physical intrusion onto an effect is a Fourth Amendment search). When the United States argued that the installation of the GPS tracker had not impinged on a reasonable expectation of privacy, the Supreme Court dismissed the argument in a single sentence, stating "we need not address the Government's contentions, because [defendant]'s Fourth Amendment rights do not rise or fall with the *Katz* formulation."[5] *Id.* at 406.

---

[5] Justice Harlan's concurring opinion in *Katz v. United States*, 389 U.S. 347, 361 (1967), described places protected by the Fourth Amendment as places in which a person had demonstrated a genuine expectation of privacy and that their expectation was one society was prepared to recognize as reasonable.

The United States in *Jones II* also attempted to argue in the alternative that the installation of the GPS tracker was a reasonable, warrantless search, but the Supreme Court held that this argument had been forfeited because it had not been presented to the D.C. Circuit. *Id.* at 413. The Supreme Court thus did not consider that alternative argument. *See id.*

Under *Jones II*, the swabbing of the door handles of the Jeep Grand Cherokee in this case was a Fourth Amendment search. Government agents physically trespassed on an effect in order to gain information. It is impossible to distinguish the facts of this case from those in *Jones II* in any way that takes this case outside the scope of the *Jones II* holding.

This is not the end of the analysis, however. The Fourth Amendment does not forbid warrantless searches, it forbids "unreasonable" searches. While searches conducted under the authority of a search warrant are presumptively reasonable, warrantless searches can also be reasonable. Under the automobile exception to the Fourth Amendment's warrant clause, first enunciated in *United States v. Carroll*, 267 U.S. 132 (1925), if law enforcement officers have probable cause to believe that a motor vehicle contains evidence of criminal activity or contraband, they may conduct a complete search of "every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982); *see also United States v. Payton*, No. 23-CR-192, 2024 WL 1343121, at *4 (D. Minn. Mar. 29, 2024), (Menendez, J., adopting R. & R. of Micko, Mag. J.).

There is no question that swabbing exterior door handles is much less intrusive than other searches that have been upheld under the automobile exception. In *Ross*, the Supreme Court held constitutional a search in which a vehicle was "thoroughly searched" and two

23

containers in the vehicle were opened. *See* 456 U.S. at 801, 825. In *Carroll* itself, federal prohibition agents searching for alcohol tore open a seat cushion of the vehicle they were searching. 267 U.S. at 172. And in *Payton*, the court upheld a search in which officers acting without a warrant examined a compartment underneath the dashboard.[6] Against this, a momentary brush of an exterior door handle with a swab is a minimal intrusion, well within the bounds of a permissible automobile exception search. Therefore, if officers had probable cause to believe that swabbing the door handles of the Jeep Grand Cherokee would lead to the discovery of evidence of the commission of a crime, they could do so without a search warrant.

The question thus becomes whether law enforcement officers, on August 29, 2023, the day the Jeep Grand Cherokee's door handles were swabbed, had probable cause to believe that the swabbing would turn up evidence of the commission of a crime. The Court finds that they did.

In summary, law enforcement had been told by a cooperating defendant that Ms. Dirksmeyer was transporting methamphetamine from the Twin Cities to Rochester in a black Jeep. The cooperating defendant stated that they had personally purchased methamphetamine from Ms. Dirksmeyer and had been present on another occasion when Ms. Dirksmeyer sold methamphetamine to a different person in a trailer in Stewartville. Detective Cooper knew that the person in Stewartville to whom Ms. Dirksmeyer was

---

[6] In *Payton*, a search warrant for the vehicle was issued, but the magistrate judge had serious concerns whether the affidavit in support of the application for a search warrant established probable cause. The magistrate judge therefore also analyzed the search under the automobile exception.

alleged to have sold methamphetamine lived in the trailer described by the cooperating defendant, and Detective Cooper had been present when a person was arrested in that trailer. During the arrest, Detective Cooper saw a clear plastic bag in the trailer containing a white powder with an appearance consistent with that of methamphetamine. A Rochester police detective also told Detective Cooper that a different cooperating defendant had stated that Ms. Dirksmeyer was involved in transporting methamphetamine from the Twin Cities to Rochester and selling it. Detective Cooper learned from public records that Ms. Dirksmeyer was the registered co-owner of a black Jeep Grand Cherokee. Through a tracker warrant on Ms. Dirksmeyer's cell phone, Detective Cooper knew Ms. Dirksmeyer made nocturnal trips to Rochester and back, not staying in any one location for more than 15 minutes. These travel patterns were indicative of narcotics trafficking, and phone tolls during these trips showed contemporaneous calls and texts with known methamphetamine users, dealers, and Cash App. Cutting against probable cause, an earlier ion swab of the Jeep Grand Cherokee tested negative for the presence of controlled substances.

This evidence easily meets the *Illinois v. Gates* standard for probable cause. Law enforcement had probable cause to believe swabbing the door handles of the Jeep Grand Cherokee would reveal evidence of the commission of a crime. Therefore, the automobile exception applies, and Ms. Dirksmeyer's motion to suppress ion scan evidence obtained from her Jeep Grand Cherokee on August 29, 2023, should be denied.

**E.  The Ion Scan of the Door Handles of Ms. Dirksmeyer's Infiniti on July 22, 2023 Was Not Supported by Probable Cause; Therefore, Evidence Seized Pursuant to the Tracker Warrant for the Infiniti Should be Suppressed, and the Ion Scan Results Should Be Excised from Search Warrant Applications.**

Turning to the ion scan swab of Ms. Dirksmeyer's Infiniti,[7] which took place significantly earlier in the investigation than the second swabbing of the Jeep Grand Cherokee's door handles, the Court cannot find that law enforcement officers had probable cause for that automobile search at the time it was carried out. The Infiniti's door handles were swabbed on July 22, 2023, approximately five weeks before the Jeep Grand Cherokee was swabbed for the second time. On July 22, law enforcement officers knew only that a cooperating defendant had told Detective Cooper that Ms. Dirksmeyer was involved in the transportation and sale of methamphetamine from the Twin Cities metropolitan area to Olmsted County *in a black Jeep*." (Gov't Ex. 2 at 2) (emphasis added). The cooperating defendant had bought methamphetamine from Ms. Dirksmeyer and knew that Mark Sanford also bought methamphetamine from Ms. Dirksmeyer. (*Id.*) Detective Cooper corroborated this by (a) noting that he had been present during an arrest in Mr. Sanford's trailer and at that time, Detective Cooper had noted the presence of a clear plastic baggie containing white crystal powder, its appearance consistent with methamphetamine, on a shelf in the living room; and (b) by confirming with public records that when Ms.

---

[7] Although the United States represented that it will not use any evidence from the tracker warrant for the Infiniti at trial (Gov't Post-Hr'g Mem. at 12), the Court will consider the constitutionality of the search and seizure because that determination could have downstream consequences.

Dirksmeyer reported an accident to the Rochester Police Department her vehicle was a black Jeep Grand Cherokee. Other public records consulted by Detective Cooper confirmed that Ms. Dirksmeyer was the registered co-owner of the Jeep Grand Cherokee and gave a New Hope address for Ms. Dirksmeyer. When a law enforcement officer went to that address the investigator saw the Jeep Grand Cherokee in the parking lot.

In all of this, there is nothing about Ms. Dirksmeyer's Infiniti, other than that she was the registered owner. The Infiniti seems to have simply been in the parking lot with the Jeep Grand Cherokee and therefore it was swabbed. The ion swabbing of the Infiniti was not supported by probable cause. Because there was no search warrant for the swabbing of the Infiniti, and the automobile exception does not apply because the swabbing was not supported by probable cause, the swabbing of the Infiniti was conducted in violation of the Constitution.

The tracker warrant for the Infiniti was premised largely on the positive ion scan swab test of the Infiniti's exterior door handles. Ms. Dirksmeyer, though, has not moved the Court to exclude evidence of the ion scan results at trial; rather, she has asked the Court to excise the ion scan results from those search warrant applications in which it appears. The Court has done so. This excision, however, does not lead to the suppression of any search warrant evidence—other than the tracker warrant for the Infiniti, which is almost wholly dependent for probable cause on the positive ion scan results. The Court therefore recommends suppression of the evidence gained from the Infiniti tracker warrant, but no other evidence.

27

### F.      Warrant for Information from Telephone Number 612-210-xxxx (Gov't Ex. 1)

The warrant for telephone number 612-210-xxxx was issued and executed on August 1, 2023. (Gov't Ex. 1.) In addition to her challenge to the ion scan evidence, which the Court discusses above, Ms. Dirksmeyer argues that the supporting affidavit lacked probable cause because there is no allegation that the cooperating defendant or anyone else used that number for any drug transaction and because Cheryl Dirksmeyer was the account subscriber for that number. (Def. Dirksmeyer's Post-Hr'g Mem. at 5, Dkt. No. 123.) Contrary to Ms. Dirksmeyer's first point, Detective Cooper averred in relevant part that a cooperating defendant said they had personally bought methamphetamine from Ms. Dirksmeyer by calling her cell phone number. The cooperating defendant had a contact listed as "Mary" on the cooperating defendant's phone, with the phone number 612-210-xxxx. Information included in the affidavit that Cheryl Dirksmeyer, Ms. Dirksmeyer's mother, was the account subscriber fortified the inference that this was Ms. Dirksmeyer's phone number. It is commonly known that parents may add their children—even their adult children—to their phone plans or provide phones to them. Thus, reading the affidavit with a common-sense approach, the affidavit linked Ms. Dirksmeyer to the 612-210-xxxx number and provided probable cause to believe that she used that telephone number to sell drugs.

Ms. Dirksmeyer next argues that the search warrant affidavit contained stale information because there are no timeframes for alleged purchases of drugs from her. "[T]here is no formula for determining when information has become stale." *United States*

28

*v. Horn*, 187 F.3d 781, 786 (8th Cir. 1999). "Time factors must be examined in the context of a specific case and the nature of the crime under investigation." *United States v. Koelling*, 992 F.2d 817, 822 (8th Cir. 1993). "Where continuing criminal activity is suspected, the passage of time is less significant." *United States v. Formaro*, 152 F.3d 768, 771 (8th Cir. 1998) (finding that a two-and-a half-week lapse after a controlled buy did not render information stale); *see United States v. Jeanetta*, 533 F.3d 651, 655 (8th Cir. 2008) (finding that two weeks between a controlled buy and the warrant application did not render information stale because of the ongoing nature of drug trafficking). "[I]n investigations of ongoing narcotics operations, intervals of weeks or months between the last described act and the application for a warrant [does] not necessarily make the information stale." *Formaro*, 152 F.3d at 771 (cleaned up) (quoting *United States v. Ortiz*, 143 F.3d 728, 732– 33 (2d Cir. 1998)).

Here, the crime under investigation—narcotics trafficking—was ongoing at the time of the warrant application. The cooperating defendant told Detective Cooper they had personally bought methamphetamine from Ms. Dirksmeyer by calling her cell phone number (although the affidavit did not specify when), and the cooperating defendant provided a phone number for "Mary," presumably Ms. Dirksmeyer, four days before the PRTT warrant for telephone number 612-210-xxxx was issued. A month-and-a-half before the warrant, Detective Cooper saw suspected methamphetamine in Mr. Sanford's trailer, where the cooperating defendant said Ms. Dirksmeyer had sold methamphetamine to Mr. Sanford. Given the ongoing nature of the drug trafficking crimes under investigation, the Court concludes that the information in the supporting affidavit was not stale.

Ms. Dirksmeyer argues further that the cooperating defendant's information was not independently corroborated. That is of no moment, because an informant's tip is sufficiently reliable to support probable cause *either* when the informant "has provided reliable information in the past *or* where his tip was independently corroborated." *United States v. Caswell*, 436 F.3d 894, 898 (8th Cir. 2006) (emphasis added). Under the first option, "[t]he reliability of a confidential informant can be established if the person has a history of providing law enforcement officials with truthful information." *United States v. Wright*, 145 F.3d 972, 975 (8th Cir. 1998). Here, Detective Cooper averred in the supporting affidavit that the cooperating defendant had provided corroborated information in the past. This was sufficient to establish the cooperating defendant's reliability for the purpose of probable cause. Under the second, independent-corroboration option, "[i]t is well established that even the corroboration of minor, innocent details can suffice to establish probable cause." *Solomon*, 432 F.3d at 828 (cleaned up). Here, Detective Cooper corroborated information provided by the cooperating defendant: that Ms. Dirksmeyer drove a black Jeep, that Mr. Sanford lived in a trailer at 4xx Main Street South in Stewartville, that Mr. Sanford was a methamphetamine user, and that methamphetamine had been in the trailer.

Finally, to the extent probable cause was lacking, the *Leon* good-faith exception applies because the officers executing the warrant acted in "objectively reasonable reliance" on it. As discussed below, the supporting affidavit did not contain a false statement that was made knowingly and intentionally, or with reckless disregard for the truth. There is nothing to indicate that the issuing judge abandoned her judicial role. The

supporting affidavit was not so deficient in probable cause that belief in its existence would be absolutely unreasonable. Nor was the face of the warrant itself deficient.

### G.      Jeep Grand Cherokee Tracker Warrant (Gov't Ex. 2)

The tracker warrant for the Jeep Grand Cherokee was issued and executed on August 29, 2023. (Gov't Ex. 2.) Ms. Dirksmeyer argues that the supporting affidavit lacked probable cause because the ion scans were illegal and location information obtained from the warrant for telephone number 612-210-xxxx was "generic." (Def. Dirksmeyer's Post-Hr'g Mem. at 5–6.) The Court has already found that the ion swab of the Jeep Grand Cherokee was not obtained in violation of the Fourth Amendment. As for the location information obtained from the warrant for 612-210-xxxx, Detective Cooper averred that, in his training and experience, the travel and timing patterns were consistent with narcotics trafficking. Thus, the ion scan results from the Jeep Grand Cherokee and location information for the 612-210-xxxx device contributed to the finding of probable cause, and probable cause existed for the Jeep Grand Cherokee tracker warrant.

The Court must consider, however, whether the fact that the ion swab results from the Infiniti were obtained unconstitutionally affects the probable cause calculus for the tracker warrant for the Jeep Grand Cherokee. The application for the Jeep Grand Cherokee tracker warrant bases probable cause in part on information obtained from the Infiniti tracker warrant. The Infiniti tracker warrant is premised on the results of the Infiniti ion scan. If the Infiniti ion scan is disregarded, and consequently no Infiniti tracker warrant had issued, then law enforcement would not have known that the tracker warrant on Ms. Dirksmeyer's phone showed it was moving independently of the Infiniti, which in turn led

to an inference that the phone must be in the other vehicle—that is, Ms. Dirksmeyer's Jeep Grand Cherokee.

For two reasons, the Court finds that the unconstitutional swabbing of the Infiniti's door handles does not require suppression of evidence obtained from the Jeep Grand Cherokee tracker warrant. First, even if one deletes from the Jeep Grand Cherokee tracker warrant application all information about the Infiniti ion scan, and all conclusions drawn from the results of that ion scan, the application still provides probable cause for the Jeep Grand Cherokee tracker warrant. Second, the officers executing the Jeep Grand Cherokee tracker warrant were justified in relying on a judge's decision to issue it.

Expanding on the first reason, exclusive of the Infiniti ion scan, the application for the Jeep Grand Cherokee tracker warrant showed:

- A cooperating defendant, whose information had been corroborated, stated that Ms. Dirksmeyer was using a black Jeep to transport methamphetamine from the Twin Cities to Olmsted County, where she sold it;

- The cooperating defendant had bought methamphetamine from Ms. Dirksmeyer personally;

- The cooperating defendant had seen Ms. Dirksmeyer sell methamphetamine to Mr. Sanford inside Mr. Sanford's trailer home in Stewartville;

- While assisting with an arrest, Detective Cooper had been in Mr. Sanford's trailer, where he saw a clear plastic baggie containing a white crystalline substance whose appearance was consistent with methamphetamine;

- Ms. Dirksmeyer's telephone, which the police were tracking under the authority of a warrant, made nighttime trips from the Twin Cities to and around Olmsted County. Although the telephone was tracked to different locations, it did not stay in any one spot for more than 15 minutes. Detective Cooper recognized this as indicative of drug dealing;

- A Rochester police detective told Detective Cooper that a second cooperating defendant said Ms. Dirksmeyer was transporting methamphetamine from the Twin Cities to Olmsted County for sale;

- Ms. Dirksmeyer reported to the Rochester police that she had been involved in a hit-and-run accident. The Rochester police noted that Ms. Dirksmeyer's vehicle was a black 2017 Jeep Grand Cherokee and that she was the listed co-owner of that vehicle;

- Investigating Ms. Dirksmeyer's telephone number yielded a subscriber address at an apartment building in New Hope, in the Twin Cities metropolitan area;

- Ms. Dirksmeyer's criminal history included multiple felony convictions of controlled substance crime, including methamphetamine convictions;

- The black Jeep Grand Cherokee registered to Ms. Dirksmeyer as co-owner was in the parking lot of the New Hope apartment in which Ms. Dirksmeyer lived; and

- An ion swab of the exterior door handles of the Jeep Grand Cherokee was positive for methamphetamine.

This is ample probable cause to support the tracker warrant for the Jeep Grand Cherokee. But even if probable cause were lacking, the police acted in objectively reasonable reliance on a search warrant issued by a state court judge. *See Leon*, 468 U.S. at 922. None of the exceptions to *Leon* apply here. There is no evidence that Detective Cooper's Jeep Grand Cherokee tracker warrant application contains any knowingly false statements or any statements made with reckless disregard for the truth; there is no evidence that the issuing judge wholly abandoned her judicial role; as the above cataloging of the evidence in the application makes clear, there can be no claim that the application was so wholly lacking in probable cause as to render official belief in the existence of probable cause entirely unreasonable; and the search warrant is not "'so facially deficient' that no police officer

could reasonably presume the warrant to be valid." *See United States v. Proell*, 485 F.3d 427, 431 (8th Cir. 2007) (citing *Leon*, 468 U.S. at 923).

The motion to suppress evidence found pursuant to the Jeep Grand Cherokee tracker warrant should be denied.

### H.    Search Warrant for Historical Records for 612-210-xxxx, dated September 1, 2023 (Gov't Ex. 3)

Ms. Dirksmeyer's specific probable-cause challenge to this warrant is that "there is nothing new in the affidavit . . . other than the fact that she had traveled between her home and Rochester" in August 2023. (Def. Dirksmeyer's Post-Hr'g Mem. at 6.) This argument is not a fair characterization of the level of detail about trips, calls, and texts described in Detective Cooper's affidavit. Moreover, according to Detective Cooper's affidavit, the timing and patterns of Ms. Dirksmeyer's travel in August 2023 were consistent with narcotics trafficking, and phone tolls for 612-210-xxxx revealed frequent calls and texts with known drug users and dealers. This information, in addition to the other information contained in the affidavit, established probable cause to believe that historical records for 612-210-xxxx would contain evidence of drug trafficking.

### I.    Search Warrant for the Jeep Grand Cherokee and Ms. Dirksmeyer, dated September 8, 2023 (Gov't Ex. 4)

On September 8, 2023, Detective Cooper applied for a search warrant for Ms. Dirksmeyer's person and her Jeep Grand Cherokee. (Gov't Ex. 4.) With respect to the travel patterns and timing described in the affidavit, Ms. Dirksmeyer argues there was no information that any drug transactions actually occurred or that she was on her way to Rochester to sell drugs. (Def. Dirksmeyer's Post-Hr'g Mem. at 6.) She also takes issue

with information provided by the confidential informant, who said he could buy methamphetamine from Tyler Miller, whose name was in Ms. Dirksmeyer's phone tolls. (*Id.*) Ms. Dirksmeyer points out that no name, physical description, or any other identifying characteristics about the supposed female drug dealer were included in the affidavit. (*Id.* at 7.)

Ms. Dirksmeyer's attempt to poke holes in probable cause by viewing certain allegations in isolation is unavailing. The issuing judge looks at the totality of the circumstances described in the affidavit, not each circumstance in isolation. Here, some of the most relevant circumstances supporting probable cause, as described in the supporting affidavit, are:

- The cooperating defendant told law enforcement that Ms. Dirksmeyer was involved in transporting and selling methamphetamine from the Twin Cities to Olmsted County in a black Jeep. Rochester is in Olmsted County.

- The cooperating defendant personally had bought methamphetamine from Ms. Dirksmeyer and had seen Ms. Dirksmeyer sell methamphetamine to Mark Sanford.

- A contact on the cooperating defendant's phone named "Mary" had a 612-210-xxxx phone number, which was later determined to be Ms. Dirksmeyer's phone number.

- Ms. Dirksmeyer used the Jeep Grand Cherokee as her primary vehicle.

- The location of the 612-210-xxxx phone number consistently matched that of the Jeep Grand Cherokee.

- On multiple occasions in August 2023, tracking devices on the 612-210-xxxx phone and the Jeep Grand Cherokee showed Ms. Dirksmeyer engage in travel patterns indicative of narcotics trafficking. Phone tolls showed contemporaneous calls and texts with known methamphetamine users, dealers, and Cash App.

- On August 26, 2023, Rochester was one of the stops on Ms. Dirksmeyer's middle of the night trip. Phone tolls from the 612-210-xxxx phone number included calls with a known methamphetamine dealer and a person with a history of selling and possessing controlled substances.

- An ion swab sample obtained from the exterior door handle of the Jeep Grand Cherokee on August 29, 2023 tested positive for methamphetamine and cocaine.

- On September 8, 2023, tracking devices showed Ms. Dirksmeyer, driving the Jeep Grand Cherokee, leave her residence and drive towards Rochester.

The totality of the circumstances described in the supporting affidavit establishes probable cause. When the allegations are viewed together, there was probable cause to believe that Ms. Dirksmeyer had engaged in drug transactions and that she was driving to Rochester to sell drugs.

As to Ms. Dirksmeyer's specific arguments, information from the confidential informant connected Ms. Dirksmeyer to known methamphetamine dealer Tyler Miller, whose name investigators had already found in Ms. Dirksmeyer's phone tolls. And, given the breadth of other information contained in the supporting affidavit, a lack of detail about the female drug-dealer from the informant barely put a dent in probable cause.

### J.      Search Warrant for 8xxx 46th Avenue, Apartment 1xx, New Hope, Minnesota, dated September 8, 2023 (Gov't Ex. 5)

The search warrant for Ms. Dirksmeyer's apartment in New Hope was issued and executed on September 8, 2023. (Gov't Ex. 5.) The only new argument Ms. Dirksmeyer makes against probable cause is that there is no "information about drugs or criminal activity at her home" and thus no nexus between her residence and criminal activity. (Def. Dirksmeyer's Post-Hr'g Mem. at 7.)

36

"[T]here must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue." *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000). "To be sure, without a nexus between a defendant's drug-dealing and the defendant's residence, evidence of the former does not provide probable cause for a warrant to search the latter." *United States v. Norey*, 31 F.4th 631, 637 (8th Cir. 2022).

Here, the nexus between drug trafficking and Ms. Dirksmeyer's New Hope residence was created by the following averments in the affidavit:

- Ms. Dirksmeyer's suspected narcotics-trafficking trips originated and ended at her residence. Investigators observed several such trips that they found consistent with narcotics trafficking in driving patterns and timing. During these trips, Ms. Dirksmeyer also called and texted known drug dealers and users.

- Investigators believed that she used the Jeep Grand Cherokee to transport methamphetamine.

- Ms. Dirksmeyer parked the Jeep Grand Cherokee in the New Hope apartment parking lot.

- Perhaps most significantly, Ms. Dirksmeyer left her apartment at 5:56 p.m. on September 8, 2023, and drove southbound in the Jeep Grand Cherokee. At 6:14 p.m., she stopped at a strip mall that had food, tanning, massage, and liquor businesses, and she resumed driving at 6:48 p.m. She was pulled over just after entering Olmsted County at 7:22 p.m. A search of the Jeep Grand Cherokee yielded 1,573.8 grams of methamphetamine.

This information established a nexus between Ms. Dirksmeyer's apartment and drug trafficking.

To the extent a nexus was lacking, the *Leon* good-faith exception applies because it was objectively reasonable for officers executing the warrant to have relied on the issuing judge's probable cause determination. "[T]he good-faith exception applies even if there is no direct nexus between a defendant's continuous course of drug trafficking and his

37

residence because an officer and an issuing judge may 'logically infer that a drug dealer would store contraband at his residence.'" *Norey*, 31 F.4th at 637 (quoting *United States v. Mayweather*, 993 F.3d 1035, 1041 (8th Cir. 2021)).

### K.   Warrant for Four Cell Phones (Gov't Ex. 6) and Warrant for iPhone (Gov't Ex. 8)

Four cell phones were found during the search of Ms. Dirksmeyer's apartment, and an iPhone was seized from her Jeep Grand Cherokee at the time of her arrest. Ms. Dirksmeyer argues that the five phones are fruits of a poisonous tree and asks that evidence seized from the phones be suppressed. The Court has found only one unlawful search or seizure; however, that search (the ion swab of the Infiniti) has no connection to the search warrants for the telephones, and accordingly, evidence seized from the four cell phones and the iPhone should not be suppressed as tainted by any search or seizure.

### L.   Defendants Are Not Entitled to a *Daubert* Hearing

Defendants ask the Court for a *Daubert* hearing—not to challenge the validity of the ion-scan evidence for trial purposes, but to challenge the reliability of the information as it was used in the search warrants. The United States disavows any intention to use the ion-scan evidence at trial.

Plain and simple, *Daubert* does not apply to search warrants. *See, e.g., United States v. Thomas*, 548 F. Supp. 3d 1212, 1224 n.11 (M.D. Fla. 2021) ("The Federal Rules of Evidence do not apply to proceedings surrounding the issuance of a search warrant, and probable cause does not require scientific certainty.") (cleaned up); *United States v. Wolfe*, No. 4:14-CR-152 RWS/NCC, 2016 WL 8310382, *4 (E.D. Mo. Dec. 14, 2021) ("[N]either

the Fourth Amendment nor the courts require that an affiant marshal trial-worthy proof or have the expertise of a high-level scientist for a judge to issue a search warrant in a drug investigation. Such qualifications are irrelevant."), *R. & R. adopted*, 2017 WL 713033 (E.D. Mo. Feb. 23, 2017); *United States v. White*, No. 3:06-CR-003-JTC/AJB, 2007 WL 9724285, *10 n.12 (N.D. Ga. Sept. 20, 2007) ("[T]he Federal Rules of Evidence expressly provide that they have no application to search warrants. . . . Moreover, *Daubert* is a trial mechanism in which the court acts as a gatekeeper to insure that speculative and unreliable opinions do not reach the jury and therefore has no application to preliminary proceedings such as affidavits in support of search warrant[s].") (cleaned up); *United States v. Pirosko*, No. 5:12-CR-327, 2013 WL 5595224, *3 (N.D. Ohio Oct. 10, 2013) ("There is no precedent or authority demanding that the *Daubert* reliability standard must be applied to investigative procedures used by law enforcement in order for the search warrant to contain probable cause for the search, nor does *Daubert* hold that this standard must be applied to the probable cause analysis."), *aff'd* 787 F.3d 358 (6th Cir. 2015). Defendants' requests for a *Daubert* hearing should be denied.

## M.     Ms. Dirksmeyer Is Not Entitled to a *Franks* Hearing

An affidavit supporting a search warrant is presumed to be truthful. *Franks v. Delaware*, 438 U.S. 154, 164 (1978). A defendant may seek a *Franks* hearing "to challenge a search warrant on the ground that the supporting affidavit contains factual misrepresentations or omissions relevant to the probable cause determination." *See United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013). Before a court will convene a *Franks* hearing, however, the defendant must make a substantial preliminary showing that (1) the

affidavit contained a false statement made either knowingly and intentionally, or with reckless disregard for the truth; and (2) with the false statement corrected or missing information inserted, the affidavit no longer establishes probable cause for the search. *United States v. Gonzalez*, 781 F.3d 422, 430 (8th Cir. 2015). Recklessness may be inferred from omissions in an affidavit when the material omitted "would have been clearly critical to a finding of probable cause." *United States v. Conant*, 799 F.3d 1195, 1200 (8th Cir. 2015) (quoting *United States v. McIntyre*, 646 F.3d 1107, 1114 (8th Cir. 2011)).

"The requirement of a substantial preliminary showing is not lightly met." *Arnold*, 725 F.3d at 898 (quoting *United States v. Mathison*, 157 F.3d 541, 548 (8th Cir. 2009)). Only material false statements or omissions will trigger a *Franks* hearing. *Franks*, 438 U.S. at 169. Materiality is tested by rewriting the application to correct the false statements or provide the missing information, and if the rewritten application still shows probable cause, then no hearing is required. *Id.* at 171–72.

Ms. Dirksmeyer has identified five statements as "knowingly misleading and inaccurate." The first statement is:

> In multiple warrant affidavits, Inv. Cooper described IMS [Ion Mobility Spectrometry] technology as being able to "detect the presence of a specific substance." This technology does not allow for it to identify controlled substances, but rather may indicate, as a presumptive test, the possible presence of controlled substances. The application for the warrant does not discuss or disclose limitations of the technology including: the presumptive nature of the test, potential false positives, or detection of baseline contamination that is not the result of illegal drug activity.

(Def. Dirksmeyer's Mem. Supp. Mot. *Franks* Hr'g at 3, Dkt. No. 126.) The Court finds that Detective Cooper's statement about the Ion Mobility Spectrometry ("IMS")

technology was not a false statement, nor was it made knowingly, intentionally, or with reckless disregard for the truth. Ms. Dirksmeyer's expert, Dr. Glenn Langenburg, takes issue with Detective Cooper's averment that IMS technology can detect the presence of a specific substance, but Dr. Langenburg also acknowledges that a sample from the Infiniti "alarmed" positively for methamphetamine and that samples from the Jeep Grand Cherokee "alarmed" positively for methamphetamine and cocaine. (Langenburg Decl. ¶¶ 26, 35–36, Dkt. No. 106-1.) That Detective Cooper did not use the same scientific language as Dr. Langenburg does not mean that his statement was false or that Detective Cooper acted knowingly, intentionally, or with reckless disregard for the truth. Furthermore, Detective Cooper was not required by *Daubert* or any other legal authority to discuss in his affidavits the limitations of IMS technology. Dr. Langenburg himself did not dispute the scientific reliability of IMS. (*Id.* ¶ 19.) Finally, if the allegedly false statement were revised, the Court finds that probable cause would still exist, in light of all the other information provided in the affidavits.

The second statement identified by Ms. Dirksmeyer as the basis for a *Franks* hearing is:

> In addition to the affidavit for the Infinity (GX 14), Inv. Cooper stated that the test "alarmed" for THC and methamphetamine. This is incorrect. It did not alarm for THC but instead indicated the possible presence of Tetryl-C (an explosive).

(*Id.*) Detective Cooper testified that he interpreted "Tetryl C" on the ion scan report as THC, based on the machine operator's explanation. (*Id.* at 114.) His statement to that effect in the affidavit for Government Exhibit 14 was, at most, negligent or a mistake. Ms.

Dirksmeyer has not shown that Detective Cooper falsely claimed—knowingly, intentionally, or with a reckless disregard for the truth—that the test alarmed for THC. In addition, if the inaccurate statement were corrected and the reference to THC removed from the affidavit, the affidavit would still establish probable cause for the search based on the positive result for methamphetamine.

The third and fourth statements identified by Ms. Dirksmeyer as the basis for a *Franks* hearing are similar:

> In the application for a search warrant post-IMS testing on 7/26/2023 (GX 14), Sean Cooper conveyed to Judge Dawson that IMS technology is "extremely accurate" and when the IMS "alarms" it is "detecting the presence" of a specific controlled substance for which it has alarmed. This too is inaccurate.

(*Id.*)

> Inv. Cooper made similar claims about the accuracy and performance of the IMS in the warrant application for the Jeep Grand Cherokee on 08/29/23 (GX 2). Specifically, Cooper relayed to Judge Jay Quam that the results of IMS testing are "extremely accurate" and that a positive alarm is "detecting the presence of a specific controlled substance." This also is misleading and inaccurate. Nonetheless, Inv. Cooper recklessly made this statement.

(*Id.*) Again, to the extent IMS technology is *not* "extremely accurate," or an "alarm" does not signify the "presence" of a substance, but a "possible presence," Detective Cooper's statement was no more than negligent or mistaken. Ms. Dirksmeyer has not shown that Detective Cooper falsely averred—knowingly, intentionally, or with a reckless disregard for the truth—that IMS technology is "extremely accurate" or that a positive alarm meant that more than a "possible presence" was detected. Finally, the Court finds that if the statements were corrected, the affidavit would still establish probable cause.

The fifth statement identified by Ms. Dirksmeyer as the basis for a *Franks* hearing is:

> Law enforcement utilized the CLEAR system and determined that it was an active Verizon wireless phone account and also stated that same system listed the specific account holder as Meredith A. Dirksmeyer. In addition, and without a warrant, utilizing the CellHawk system, claimed that the subject number lists Ms. Dirksmeyer as the account holder with clear inference that it was Meredith Dirksmeyer. This again was misleading, inaccurate and not true. The named account holder for that specific Verizon account is and was Cheryl Dirksmeyer, Ms. Meredith Dirksmeyer's mother.

(*Id.* at 4.) This statement concerns telephone number 469-712-xxxx. The United States agrees that any argument is academic because law enforcement did not gather any information from this warrant. The Court agrees. In addition, Ms. Dirksmeyer has not shown that Detective Cooper made a false statement with the requisite mental state or that if the information were corrected probable cause would dissipate.

### N.     No Evidence Should Be Excluded Based on Bad Faith or Due-Process Violations

Mr. Cone-Wade contends that officers who obtained the ion swab evidence and muted their body cameras acted in bad faith and violated due process. He relies on *Arizona v. Youngblood*, 488 U.S. 51 (1988), to support his position that officers have a constitutional obligation to activate body cameras. But *Youngblood* was about law enforcement's failure to preserve potentially exculpatory evidence; it did not impose an affirmative, due-process based duty to record potentially exculpatory evidence in the first place. *See id.* at 58 ("We therefore hold that unless a criminal defendant can show bad faith on the part of the police, *failure to preserve* potentially useful evidence does not constitute a denial of due process of law.") (emphasis added).

In *United States v. Aguirre-Cuenca*, No. 21-4307, 2023 WL 245710, at *3 (4th Cir. Jan. 18, 2023), the court "assume[d] . . . without deciding that *Youngblood* also applies to the failure to create exculpatory evidence through failure to activate a body camera." *Id.* (emphasis omitted). Even though the officer in *Aguirre-Cuenca* had not complied with departmental policy to activate his body camera, there were no facts evidencing bad faith, and thus no due process violation. *Id.* Similarly, here, Mr. Cone-Wade has not identified facts establishing bad faith by any officer. An officer's "failure to activate body-worn cameras alone does not constitute a due process violation." *United States v. Tillard*, No. 18-CR-6091-FPG, 2020 WL 57198, at *5 (W.D.N.Y. Jan. 6, 2020); *see also United States v. Taylor*, 312 F. Supp. 3d 170, 178 (D.D.C. 2018) (no bad faith even though officer failed to follow departmental policy); *United States v. Brown*, No. 2:17-CR-58-JCM-VCF, 2017 WL 8941247, at *15–16 (D. Nev. Aug. 14, 2017) (finding officers acted, at most, negligently in failing to activate their body cameras), *R. & R. adopted*, 2018 WL 451556 (D. Nev. Jan. 16, 2018).

## V.     Recommendation and Order

Based on all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.  Defendant Meredith Amber Dirksmeyer's Motion to Suppress Evidence from Search Warrants (Dkt. No. 57) be **GRANTED** as to the tracker warrant for the Infiniti, **DENIED AS MOOT** as to the warrant for 469-712-0xxx, and **DENIED** in all other respects;

44

2. Defendant Meredith Amber Dirksmeyer's Motion to Suppress Evidence from Search and Seizure (Dkt. No. 59) be **DENIED**;

3. Defendant Meredith Amber Dirksmeyer's Motion to Suppress Statement (Dkt. No. 115) be **DENIED AS MOOT**;

4. Defendant John Henry Cone-Wade, Sr.'s Motion to Suppress Evidence Obtained as a Result of Search and Seizure (Dkt. No. 54) be **DENIED**;

5. Defendant John Henry Cone-Wade, Sr.'s Motion to Suppress Evidence Obtained as a Result of Search and Seizure of Four Phones (Dkt. No. 55) be **DENIED**; and

6. Defendant John Henry Cone-Wade, Sr.'s Motion to Suppress Ion Swab Evidence (Dkt. No. 107) be **DENIED**.

**FURTHER, IT IS ORDERED** that:

1. Defendant Meredith Amber Dirksmeyer's Motion for a *Daubert* Hearing (Dkt. No. 99) is **DENIED**;

2. Defendant Meredith Amber Dirksmeyer's Motion for a *Franks* Hearing (Dkt. No. 125) is **DENIED**;

3. Defendant John Henry Cone-Wade, Sr.'s Motion for *Daubert* Hearing (Dkt. No. 106) is **DENIED**; and

4.   Defendant John Henry Cone-Wade, Sr.'s Motion for Hearing Pursuant to

   *Franks v. Delaware* (Dkt. No. 128) is **DENIED**.


Dated: August 29, 2024                    *s/ John F. Docherty*
                                          JOHN F. DOCHERTY
                                          United States Magistrate Judge


## NOTICE

**Filing Objections:** The Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under LR 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).